In The
Court of Appeals
For The
First District of Texas
____________

NO. 01-02-00210-CR
____________

ERIC VAUGHN SHULTZE, Appellant

V.

THE STATE OF TEXAS, Appellee
 



On Appeal from the 361st District Court
Brazos County, Texas
Trial Court Cause No. 28,691-361
 

 
 
OPINION ON MOTION FOR REHEARING
          We withdraw our Opinion of May 13, 2004 and issue the following Opinion
in its stead. We deny appellant’s motion for rehearing.
          Appellant, Eric Vaughn Schultze, and his co-defendants,


 Valin Thomas Klock
and Scott Alan Zunker, were indicted for the first-degree felony offense of aggravated
sexual assault.


 After appellant refused to enter a plea, the trial court entered a plea
of not guilty on his behalf.


 A jury found appellant and his co-defendants guilty and
assessed punishment of 30 years in prison for appellant, 22 years for Klock, and 15
years for Zunker.
          In seven points of error, appellant contends that his trial counsel was
ineffective and that the trial court erred in (1) denying his request for a severance; (2)
admitting a videotape of the death of appellant’s roommate, John Hickman, at the
punishment stage of trial; (3) excluding testimony about prison conditions; (4)
allowing the State to argue about the crime’s effect on the victim’s parents; (5)
refusing to instruct the jury, at the punishment stage, about the elements of the
extraneous offenses; and (6) refusing to suppress a videotape of the sexual assault at
the guilt stage of trial. We affirm. 
 
Background
          On November 19, 2000, College Station Police Department Detective Chad
Harkrider was called to investigate the alcohol-related death of John Hickman at 3311
Bahia in College Station. When he arrived at the scene and discovered there were
numerous people to interview, he contacted College Station Police Sergeant Chuck
Fleeger for assistance. Appellant and Klock were two of the people interviewed in
connection with Hickman’s death. During the course of the investigation, Detective
Harkrider received an anonymous tip that there was a videotape of Hickman made on
the night he died. 
          On March 27, 2001, Jana French, a friend of Klock’s, provided the College
Station Police Department with a videotape she had obtained from Klock. Fleeger
watched the videotape and discovered that, in addition to depicting Hickman the night
that he died, 18 minutes and 45 seconds of the tape showed three men sexually
assaulting an unconscious female. Fleeger recognized appellant and Klock as two of
the three assailants because he had recently interviewed them in connection with
Hickman’s death. He later determined the identities of the complainant


 and the third
assailant, Zunker. 
          The sexual assault


 began with Zunker and appellant entering a room where
Klock was having sexual intercourse with the complainant, who appeared to be
unconscious and physically unable to resist. Appellant, while manning the video
camera said, “in her fucking cunt,” and Zunker attempted to insert a baseball in the
complainant’s vagina. Zunker manned the video camera while appellant inserted the
handle of a toilet plunger into the complainant’s vagina. Appellant told Zunker,
“Make sure you get this on tape.” When the plunger handle was inserted into the
complainant’s vagina, she moaned and said, “Ow. Stop,” and continued to struggle. 
The three men laughed throughout the entire sexual assault. At one point, Zunker lit
a cigarette and burned the complainant’s vagina with the lit cigarette. Zunker then,
mockingly, said, “Ow. That’s got to hurt,” and he proceeded to flick ashes onto the
complainant’s buttocks. Zunker and Klock also inserted a screwdriver and other
objects into the complainant’s vagina. The men continued to laugh as they performed
these various acts on the unconscious complainant, with appellant declaring, “this is
fucking hilarious” at one point during the assaults. 
          Police officers arrested appellant, Klock, and Zunker the day after Sergeant
Fleeger received the videotape. Also on that day, police officers searched the house
at 3311 Bahia and found a video camera and a camera bag that contained another
videotape. This second videotape showed appellant urinating on an unconscious
Hickman. 
          During his investigation, Fleeger determined that the sexual assault occurred
in July 2000, seven or eight months before the videotape was discovered.
Motion to Suppress Evidence
          In point of error seven, appellant contends that the trial court erred by denying
his motion to suppress the sexual assault videotape “on the ground that Article 38.23
does not make stolen property inadmissible if a thief gives the property to the police.” 
See Tex. Code Crim. Proc. Ann. art. 38.23 (Vernon Supp. 2004-2005). 
Standard of Review
          A trial court’s ruling on a motion to suppress evidence will not be set aside
unless there is an abuse of discretion. Villarreal v. State, 935 S.W.2d 134, 138 (Tex.
Crim. App. 1996); Taylor v. State, 945 S.W.2d 295, 297 (Tex. App.—Houston [1st
Dist.] 1997, pet. ref’d). We will afford almost total deference to a trial court’s
determination of facts supported by the record, especially when the findings are based
on the evaluation of credibility and demeanor. Guzman v. State, 955 S.W.2d 85, 89
(Tex. Crim. App. 1997); Spight v. State, 76 S.W.3d 761, 765 (Tex. App.—Houston
[1st Dist.] 2002, no pet.). The appellate courts may review de novo “mixed questions
of law and fact” not falling within this category. Guzman, 955 S.W.2d at 89.
Standing
          Appellant filed a pretrial motion to suppress the videotape because “the
videotape was taken from a home in which [appellant] had a privacy interest in
violation of Article 38.23 V.A.C.C.P.” Article 38.23 provides as follows:
No evidence obtained by an officer or other person in violation of any
provision of the Constitution or laws of the State of Texas, or of the
Constitution or laws of the United States of America, shall be admitted
in evidence against the accused on the trial of any criminal case.
 
In any case where the legal evidence raises an issue hereunder, the jury
shall be instructed that if it believes, or has a reasonable doubt, that the
evidence was obtained in violation of the provisions of this Article, then
and in such event, the jury shall disregard any such evidence so
obtained.

Tex. Code Crim. Proc. Ann. art. 38.23(a). Appellant contends that Klock broke
into the Bahia house and stole the videotape from appellant.
          In its order denying the motion to suppress the videotape, the trial court found
that “there [was] sufficient evidence to show that [Klock] had permission to be on the
Bahia premises until well after Spring Break.” The trial court also found that, “there
is no evidence in the record that Defendant Klock, even if he took the video without
Defendant Schultze’s consent, intended to deprive Schultze of ownership.” The trial
court did not state whether appellant had standing to complain of Klock’s taking the
videotape. However, failure to prove standing may be raised at any time, including
for the first time on appeal. State v. Klima, 934 S.W.2d 109, 110-11 (Tex. Crim. App.
1996); Pennywell v. State, 84 S.W.3d 841, 843-44 (Tex. App.—Houston [1st Dist.]
2002, no pet.).
          Standing is a question of law, which we review de novo. State v. Johnson, 896
S.W.2d 277, 285 (Tex. App.—Houston [1st Dist.] 1995), aff’d, 939 S.W.2d 586 (Tex.
Crim. App. 1996). To have standing, or a reasonable expectation of privacy, a
defendant must show: (1) that he had an actual, subjective expectation of privacy,
exhibited by measures taken to protect the privacy of the property in question, and (2)
that his subjective expectation of privacy is one that society is prepared to recognize
as reasonable. See Jackson v. State, 745 S.W.2d 4, 7 (Tex. Crim. App. 1988).
          During the suppression hearing, appellant called Travis Blount to testify. 
Blount testified that he was appellant’s cousin and lived with appellant at 3311 Bahia
Street at the time of the assault. Blount testified that the video camera used to film
the assault belonged to Taylor Jordan—it was not appellant’s camera. Travis testified
that when Jordan left the camera at the house, he left it in the case, and it was possible
that there were some tapes left in the case. Travis never saw what brand of
videotapes appellant bought; therefore, he could not comment on whether the
videotape used to tape the assault was one of the tapes appellant bought or one that
may have already been in Jordan’s video case.
          Sergeant Fleeger testified during the suppression hearing that, after the police
saw the videotape, they obtained a search warrant for the house on Bahia. When they
executed the warrant, they found the video camera and case in the living room. They
found an .8 mm videotape in the case. Through his investigation, Fleeger concluded
that the video camera and bag did not belong to appellant. Appellant did not testify
at the suppression hearing.
          The evidence elicited during the suppression hearing did not reveal who owned
the videotape that contained the recording of the assault, where the videotape was
usually kept, or from where the videotape was removed. There is no evidence in the
record indicating what steps appellant took to protect the videotape. Nor is there any
evidence that access to the videotapes was limited in any way. In fact, Blount
testified that the occupants of the Bahia house frequently watched tapes they made
with their friends. He testified that, after Klock moved out, Blount came home to find
Klock, alone in the house, watching a videotape of Hickman’s death. 
          Appellant failed to present sufficient evidence during his suppression hearing
to establish that he took any measures to protect the privacy of the property in
question and, therefore, did not show he had a reasonable expectation of privacy in
the videotape recovered from their home. See Jackson, 745 S.W.2d at 7. The
evidence in the record does not establish that appellant had standing to have the
videotape suppressed. Accordingly, we hold that the trial court did not abuse its
discretion in denying appellant’s motion to suppress the videotape.
          We overrule point of error seven.
Ineffective Assistance of Counsel
          In point of error one, appellant contends that his trial counsel was ineffective. 
The standard of review for evaluating claims of ineffective assistance of counsel is
set forth in Strickland v. Washington, 466 U.S. 668, 687-96, 104 S. Ct. 2052, 2064-69
(1984); see Thompson v. State, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). Appellant
must show both that (1) counsel’s performance was so deficient that he was not
functioning as acceptable counsel under the Sixth Amendment, and (2) there is a
reasonable probability that, but for counsel’s error or omission, the result of the
proceedings would have been different, i.e., sufficient to undermine confidence in the
outcome. Strickland, 466 U.S. at 687-96, 104 S. Ct. at 2064-69. Effective assistance
of counsel does not mean errorless counsel. See Saylor v. State, 660 S.W.2d 822, 824
(Tex. Crim. App. 1983). In determining whether counsel was ineffective, we
consider the totality of the circumstances of the particular case. Thompson, 9 S.W.3d
at 813.
          It is the defendant’s burden to prove ineffective assistance of counsel by a
preponderance of the evidence. Thompson, 9 S.W.3d at 813. A defendant must
overcome the presumption that, under the circumstances, the challenged action might
be considered sound trial strategy. Gamble v. State, 916 S.W.2d 92, 93 (Tex.
App.—Houston [1st Dist.] 1996, no pet.). An appellate court will not find
ineffectiveness based on speculation. Henderson v. State, 29 S.W.3d 616, 624 (Tex.
App.—Houston [1st Dist.] 2000, pet. ref’d); Gamble, 916 S.W.2d at 93. Assertions
of ineffective assistance of counsel must be firmly founded in the record. Bone v.
State, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002).
Sole Defense
          Appellant argues that his trial counsel failed to present his sole defense—that
the videotape was illegally obtained and, thus, subject to suppression. See Tex. Code
Crim. Proc. Ann. art. 38.23(a). Appellant contends that his trial counsel failed to
ask the trial court to instruct the jurors, under article 38.23(a), that they must
disregard the videotape if they believed Klock obtained it illegally. He argues that
this was his “sole defense before the jury, but counsel never presented it, thus
guaranteeing a conviction, as shown by his three-page argument that gave jurors no
reason whatever to vote not guilty.”
          However, as noted above, appellant lacked standing to suppress the videotape. 
Because appellant was precluded from obtaining a 38.23(a) instruction to the jury
regarding the videotape, his counsel’s failure to ask for one was not deficient.
Multiple Serious Errors
          Appellant also argues that his trial counsel committed multiple serious errors
that should diminish this Court’s confidence in the outcome of the punishment
hearing. Appellant cites six examples of alleged ineffectiveness of his counsel: (1)
in opening argument during punishment, the prosecutor, without objection, accused
appellant of having committed a “first-degree felony offense” of evading arrest,
which is really a Class A misdemeanor; (2) trial counsel failed to elicit testimony
regarding appellant’s reasons for not calling for help earlier on the night that
Hickman died; (3) trial counsel failed to object to the prosecutor’s argument as being
outside the record; (4) trial counsel failed to object to criticisms of appellant for
exercising his constitutional rights; (5) trial counsel failed to object to a co-defendant’s argument seeking a severe sentence for appellant; and (6) trial counsel
failed to object to the prosecutor’s arguments that were outside the record. 
          First Degree Felony Offense
          Appellant argues that his trial counsel was ineffective for failing to object to
the State’s classification of evading arrest as a first degree felony offense. The
statement in question was as follows:
We’re going to show you an incident that occurred with respect to Mr.
Schultze, just a few months ago while he was on bond in this case, a
first degree felony offense in which he led police on a hundred-mile-an-hour-plus chase, refusing to stop.

(Emphasis added.) The aggravated sexual assault of the complainant was a first
degree felony offense, and the record above indicates that the prosecutor was
referring to this offense, not “evading arrest,” as a first degree felony. Appellant’s
trial counsel was not ineffective in not objecting to this statement.
          Reason for Delayed Call for Help 
          The trial court excluded, as hearsay, testimony from Amanda Toepperwein,
appellant’s friend, that appellant did not call for help earlier in the night of Hickman’s
death because Hickman was on bail for intoxication assault at the time of his death,
and his intoxicated state was a clear violation of the conditions of his bond. 
Appellant argues that his trial counsel was ineffective in failing to introduce the
testimony from other sources. Appellant argues that this testimony was vital to show
his “concern, not disregard, for Hickman’s welfare.”
            Toepperwein was allowed to testify that, the night Hickman died, appellant was
“scared,” “worried,” and “concerned” about Hickman. Hickman was “drunk” and
“passed out all the time,” so everyone thought this was “a normal night.” She also
testified that she called 9-1-1, but couldn’t “get anything out” so she gave the phone
to appellant who “took control of the situation from that moment on.” The
Toepperwein testimony that was allowed established that the occupants of the Bahia
house “pranked” on each other frequently, and that appellant was concerned about
Hickman, who was his friend. Furthermore, Detective Harkrider testified that
appellant did not return from work until 3:30 a.m. on the morning of Hickman’s
death, and Hickman was alone and already passed out on the couch. This was only
approximately 30 minutes before Toepperwein arrived and called 9-1-1. 
          Accordingly, we cannot conclude, based on the record, that appellant’s trial
counsel’s performance, in not introducing evidence that Hickman was on bond, was
so deficient that he was not functioning as acceptable counsel. 
          Argument Outside the Record
          Appellant contends that, during the punishment stage argument, Zunker’s
counsel accused appellant of stealing from his employer by letting Zunker, a fellow
employee, eat and drink for free. Appellant suggests that this characterization was
particularly harmful because it rebutted testimony from several witnesses that
appellant was a dedicated, loyal, hardworking employee. 
          However, the statement was actually made during Zunker’s opening statement;
prior to the presentation of punishment evidence; therefore, an objection as being
“outside the record” would have been inappropriate, and counsel’s failure to object
to the remark was not deficient.
          Exercising Constitutional Right
          Appellant also contends that his trial counsel was ineffective for failing to
object to an improper argument made by Zunker’s attorney. Zunker’s attorney
compared Zunker, who had been in jail for 11 months before trial without posting
bail, to appellant who, he declared, was “out running around” during this time. 
Appellant argues that it was improper for Zunker’s counsel to disparage appellant for
exercising “his Eighth Amendment constitutional right to be punished after being
convicted, instead of before, like Zunker.” 
          During his opening statement prior to the presentation of punishment evidence,
Zunker’s attorney described Zunker as aimless and on the “wrong track” long before
he met appellant. Zunker’s attorney argued that, when Zunker was arrested and
charged with a first degree felony, “there began to be the change in Scott Zunker.” 
He had been in jail ever since because he could not post bail. “He hasn’t been
running around like the others.” “So he’s got to sit there. . . . He can’t drink. . . . At
first anger, depression – severe depression. Embarrassment.” Zunker’s trial counsel
further explained that, once Zunker “dried out,” he began to pursue his faith and “he
even considers 11 months in jail now a blessing.” 
          The focus of Zunker’s attorney’s remarks was on Zunker’s “change,” not on
appellant. From this record, we cannot conclude that appellant’s trial counsel’s
performance, in not objecting to the above statement made by Zunker’s attorney, was
so deficient that he was not functioning as acceptable counsel. 
          Zunker’s Attack 
          Appellant contends that Zunker’s attorney, during his punishment argument, 
made a “nine-page attack” on appellant, ending with a suggestion of “a severe
sentence for one person [appellant] and probation for another.” He argues that his
trial counsel was ineffective in failing to object that it was improper for Zunker’s
lawyer “to be arguing for a severe sentence for appellant.” 
          At the conclusion of Zunker’s closing argument at the punishment stage, he
stated:
I asked you in the jury selection phase if you could separate these
people out and you-all promised me you could. You promised me then. 
I ask you to hold to that now. 
 
Is it conceivable to you that you could give a severe sentence to
one person and probation to another? Anybody have a problem doing
that in a proper case? None of you raised your hand.

Thus, the record reveals that Zunker’s counsel did not, in fact, argue for a “severe
sentence for appellant,” and his counsel’s failure to object to the above statement was
not deficient. 
          Outside the Record
          Finally, appellant contends that his trial counsel was ineffective for failing to
object when the prosecutor argued outside the record. In his closing argument, the
prosecutor stated, “For Eric Schultze, you can watch that video of the night that John
Hickman died and ask yourself: Does he deserve even more? John Hickman could
have been saved that night.” 
          Permissible jury argument falls within one of four categories: (1) summation
of the evidence; (2) reasonable deductions from the evidence; (3) pleas for law
enforcement; and (4) response to opposing counsel. Felder v. State, 848 S.W.2d 85,
94-95 (Tex. Crim. App. 1992). 
          Assuming, without deciding, that the prosecutor’s closing remarks were not a 
reasonable deduction from the evidence, as the State contends they were, there are
several reasons why the jury could have given appellant a more severe punishment
than the other defendants, not the least of which are that he had more extraneous
offenses than they did, his police statement indicates he refused to show any remorse
for the sexual assault incident,


 and he was the only one of the defendants present in
the two Hickman videotapes. Accordingly, appellant has failed to demonstrate that
there is a reasonable probability that, but for his counsel’s failure to object to the
above statement, the results of the punishment proceeding would have been different.
Single Egregious Error
          Appellant argues that a single egregious error by trial counsel can constitute
ineffective assistance, and that no hearing on ineffectiveness or evidence of trial
strategy is required. See Thompson, 9 S.W.3d at 813. Here, however, appellant has
not presented any error egregious enough to constitute ineffective assistance of
counsel. Accordingly, we hold that appellant has not met his burden to prove
ineffective assistance of counsel by a preponderance of the evidence.
          We overrule point of error one.
Severance
          In point of error two, appellant argues that the trial court erred in denying
appellant’s motion for severance, especially at the punishment stage.
          Severance is not a matter of right, but rests within the sound discretion of the
trial court. Peterson v. State, 961 S.W.2d 308, 310 (Tex. App.—Houston [1st Dist.]
1997, pet. ref’d). To show an abuse of discretion, an appellant bears the heavy
burden of showing clear prejudice. Id.
          A trial court must order a severance upon a timely motion and upon
introduction of evidence that establishes either (1) that there is a previous admissible
conviction against one defendant or (2) that a joint trial would be prejudicial to any
defendant. Tex. Code Crim. Proc. Ann. art. 36.09 (Vernon 1981); Aguilar v. State,
26 S.W.3d 901, 903 (Tex. Crim. App. 2000). Specifically, article 36.09 provides that:
Two or more defendants who are jointly or separately indicted or
complained against for the same offense or any offense growing out of
the same transaction may be, in the discretion of the court, tried jointly
or separately as to one or more defendants; provided that in any event
either defendant may testify for the other or on behalf of the state; and
provided further, that in cases in which, upon timely motion to sever,
and evidence introduced thereon, it is made known to the court that
there is a previous admissible conviction against one defendant or that
a joint trial would be prejudicial to any defendant, the court shall order
a severance as to the defendant whose joint trial would prejudice the
other defendant or defendants. 

Tex. Code Crim. Proc. Ann. art. 36.09.
          Generally, when two defendants are jointly indicted for the same offense, they
should be tried jointly. Dickerson v. State, 87 S.W.3d 632, 639 (Tex. App.—San
Antonio 2002, no pet.). However, the trial court may order separate trials, at its
discretion. Id. If a joint trial would prejudice either defendant, upon proper motion
to sever, the trial court must sever the trial of the defendant whose joint trial could
prejudice the other. Id. 
          The mere allegation that prejudice will result is not evidence of, or a sufficient
showing of prejudice, as required under article 36.09, particularly when the severance
is discretionary with the trial court. Mulder v. State, 707 S.W.2d 908, 915 (Tex.
Crim. App. 1986). If no evidence is offered in support of the motion to sever, the trial
court does not err in overruling the motion. See Sanne v. State, 609 S.W.2d 762, 776
(Tex. Crim. App. 1980). 
          On appeal, appellant clearly states that he did not argue for severance based on
the State’s evidence and argument, but because of Zunker’s and Klock’s evidence and
argument. Appellant argues that the trial strategy employed by Zunker and Klock
was to establish that appellant was the one with the camera. He was the “director”
of these videos, and Zunker and Klock were merely following appellant’s direction. 
Consequently, appellant was defending himself against three prosecutors–Zunker’s
attorney, Klock’s attorney, and the district attorney.
          All three defendants sought severance during punishment. Zunker and Klock
moved for severance when the State introduced the videotape of Hickman’s death. 
The attorneys argued that the videotape was so prejudicial that an instruction to
disregard as to their two clients would not sufficiently overcome the prejudicial
effect. Zunker’s attorney re-urged his request for a severance at the conclusion of
lengthy testimony about an assault appellant committed. He complained that the
testimony regarding the fight would never have been introduced had the cases been
severed and that Zunker was harmed by the testimony.
          In his brief to this Court, appellant states that he renewed his motion for
severance twice during the punishment stage. Appellant refers us to two places in the
appellate record to support this statement.


 The first reference was made after Zunker
testified, and Klock’s and appellant’s attorneys moved for severance because they
believed Zunker’s testifying, in a sense, commented on Klock’s and appellant’s
ability to testify, but decision not to testify. 
          The second reference again stated 
we would reurge the Motion for Severance based upon the testimony,
the fact that Scott Zunker testified in the case and I anticipate that there
will be – I anticipate that there will be closing arguments made by
Zunker’s attorney specifically on the issue of Defendant Zunker’s
waiving his Fifth Amendment right and taking the witness stand and
being confronted, willing to confront himself by cross-examination
based upon: A, the fact that Zunker did testify; and 2, anticipating
closing arguments. 

This is a different basis for severance than appellant is raising on appeal—that he was
forced to defend against three prosecutors. 
            The Texas Rules of Appellate Procedure require that, in order for an issue to
be preserved for appeal, there must be a timely objection, which specifically states the
legal basis for the objection. Tex. R. App. P. 33.1(a). It follows, that an objection
stating one legal basis may not be used to support a different legal theory on appeal. 
See Zillender v. State, 557 S.W.2d 515, 517 (Tex. Crim. App. 1977). Courts have
routinely held that where a complaint on appeal does not comport with an objection
made at trial, the error is not preserved on the complaint. Goff v. State, 931 S.W.2d
537, 551 (Tex. Crim. App. 1996); Broxton v. State, 909 S.W.2d 912, 918 (Tex. Crim.
App. 1995); Dunn v. State, 819 S.W.2d 510, 524-25 (Tex. Crim. App. 1991)
(discussing the importance of specific objections required under Rule 52, predecessor
to Rule 33.1). 
          Here, appellant presents a different basis for severance on appeal than was
raised in the trial court. An objection raised on appeal will not be considered if it
varies from the objection made at trial. Coffey v. State, 796 S.W.2d 175, 179 (Tex.
Crim. App. 1990). 
          Because his complaint on appeal does not comport with his objections made
at trial, appellant has failed to preserve the issue for review. Tex. R. App. P. 33.1.
          We overrule point of error two.
 Erroneously Admitted/Excluded Evidence
          In points of error three and four, appellant argues that the trial court erred in
(1) admitting a videotape and other evidence of Hickman’s death and evidence of
appellant urinating on Hickman and (2) excluding Leroy Hall’s testimony about
prison conditions. 
Standard of Review
          We review a trial court’s decision to admit or exclude evidence for an abuse
of discretion. Green v. State, 934 S.W.2d 92, 101-02 (Tex. Crim. App. 1996). Where
the trial court’s evidentiary ruling is within the “zone of reasonable disagreement,”
there is no abuse of discretion, and the reviewing court must uphold the trial court’s
ruling. Id. All relevant evidence is admissible, except as otherwise provided by
Constitution, by statute, by the rules of evidence, or by other rules prescribed
pursuant to statutory authority. Tex. R. Evid. 402. Evidence is relevant if it tends
to make the existence of any consequential fact more or less probable than it is
without the evidence. Tex. R. Evid. 401. After the defendant has been found guilty,
evidence may be offered by the State and the defendant “as to any matter the court
deems relevant to sentencing.” Tex. Code Crim. Proc. Ann. art. 37.07 § 3(a)(1)
(Vernon Supp. 2004). 
          The erroneous admission or exclusion of evidence does not result in reversible
error unless it affects a substantial right of the accused. See Tex. R. App. P. 44.2(b);
Alexander v. State, 137 S.W.3d 127, 130 (Tex. App.—Houston [1st Dist.] 2004, pet.
ref’d). Substantial rights are affected when the error has a substantial and injurious
effect or influence in determining the jury’s verdict. King v. State, 953 S.W.2d 266,
271 (Tex. Crim. App. 1997). 
John Hickman’s Death
          In point of error three, appellant contends that the trial court erred in admitting
a videotape and other evidence of John Hickman’s death and evidence that appellant
urinated on Hickman on another occasion.
          Appellant videotaped Hickman shortly before Hickman died of an overdose of
alcohol. The videotape shows that, while Hickman lay, unconscious, on a couch in
the living room of the Bahia house, appellant and several other men, laughed at him,
poured water on his head, and shaved his pubic hair with an electric razor. This
recording was made on the same videotape on which the sexual assault had been
recorded. Another videotape that was recovered, pursuant to a search warrant,
showed appellant urinating on Hickman, while Hickman lay unconscious in bed. The
two Hickman recordings were not filmed on the same night.
          Guilt Stage —Background Contextual Evidence 
          Appellant argues that any reference to Hickman’s death was inadmissible at the
guilt stage because it was “background contextual evidence” rather than “same
transaction” contextual evidence.
          The Court of Criminal Appeals has distinguished two types of background
evidence admissible under rule 404(b): (1) evidence of other offenses connected with
the primary offense, referred to as “same transaction contextual evidence” and (2)
general background evidence, referred to as “background contextual evidence.” 
Mayes v. State, 816 S.W.2d 79, 86-87 (Tex. Crim. App. 1991). Background
contextual evidence is “proof of facts that do not bear directly on the purely legal
issues, but merely fill in the background of the narrative and give it interest, color,
and lifelikeness.” Id. at 87. In other words, the evidence must be necessary to the
jury’s understanding of the instant offense because the circumstances of the offense
would make little or no sense without the admission of the background contextual
evidence. See id. In Mayes, the Court of Criminal Appeals held that it was error to
admit background evidence when the testimony at issue constituted evidence of
appellant’s character. Id. at 88.
          Appellant contends that, because Hickman died more than four months after
the sexual assault, evidence of Hickman’s death constituted “background contextual”
evidence and not “same transaction” evidence and was, therefore, inadmissible. 
Evidence of Hickman’s death was not necessary to show how the police acquired the
tape or how they identified appellant on it.
          Assuming, without deciding, that the admission of the evidence was improper,
appellant has not shown that he was harmed by the admission of such evidence at the
guilt stage or that the jury was improperly swayed by the admission in its
determination of appellant’s guilt. See King, 953 S.W.2d at 271. As appellant
concedes in his brief to this Court, “the evidence of appellant’s guilt, [the sexual
assault video], was overwhelming.” 
          Punishment Stage—Unduly Prejudicial
          Appellant also argues that the videotape of Hickman’s dying moments and the
urination scene should have been excluded under Texas Rule of Evidence 403 at the
punishment stage.
          A trial court has broad discretion in determining the admissibility of evidence
presented at the punishment phase of trial. Henderson, 29 S.W.3d at 626. Trial
courts may admit evidence deemed relevant to sentencing, including evidence of
other crimes or bad acts. See Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1)
(Vernon Supp. 2004-2005).


 At the punishment hearing, relevant evidence is that
which assists the fact finder in determining the appropriate sentence given the
particular defendant in the circumstances presented. Rogers v. State, 991 S.W.2d
263, 265 (Tex. Crim. App. 1999). This language grants wide latitude in the
admission of evidence deemed relevant, including evidence arising after the offense. 
Contreras v. State, 59 S.W.3d 362, 365 (Tex. App.—Houston [1st Dist.] 2001, no
pet.). Even relevant evidence, however, may be excluded if its probative value is
substantially outweighed by the danger of unfair prejudice. See Tex. R. Evid. 403. 
As used in rule 403, “unfair prejudice” means the undue tendency of the evidence to
suggest a decision on an improper basis. See Rogers, 991 S.W.2d at 266. We will
not disturb a trial court’s determination regarding the admissibility of relevant
evidence unless an abuse of discretion has been shown. See Green, 934 S.W.2d at
101-02. 
          Appellant does not assert that the Hickman videotapes were irrelevant. He
contends, however, that the probative value of the tapes was outweighed by their
prejudicial effect. 
          Waiver
          Texas Rule of Evidence 403 must be specifically invoked in order to preserve
error under that rule. Montgomery v. State, 810 S.W.2d 372, 389 (Tex. Crim. App.
1991); Tex. R. App. P. 33.1. Appellant refers us to four places in the record where
he contends he made a specific 403 objection.
          The first reference involves argument relating to Zunker’s motion in limine.
Zunker attempted to prevent the officers from testifying that they recognized
Zunker’s voice on the sexual assault tape from previous encounters they had with
Zunker. After the trial court overruled the motion in limine “to the extent of its
broadness,” Zunker’s attorney responded, “. . . It’s an extraneous offense, and it—the
prejudicial nature of it outweighs the probative value.” As the trial court confirmed,
this objection was based on a concern that the officers would testify, “Yeah, we know
the guy from before because of other investigations we’ve done.” This objection did
not pertain to the same concerns appellant is now raising on appeal. Therefore,
Zunker’s objection did not preserve this point of error.
          Next, appellant refers us to a portion of the record where he complained that
the Hickman video contains hearsay. Counsel further urged 
the Court to engage in a 403 balancing test because of the inflammatory
nature of the comments that are made. 
 
Specifically, there are, I believe, some racial overtones to the
comments that are made by third parties in the room. I think there is
also some other inflammatory statements particularly of the nature
saying, “die, die” or something “I hope you die.” I think that’s what I
heard. 
 
I would argue that the (sic) any probative relevant evidence that
could be gathered by that portion of the video is substantially
outweighed by the confusion of issues, the prejudicial effect; and I
would ask the Court to—if it overrules my objections on hearsay and
authentication basis that engage and rule on my 403 objection.

This 403 objection specifically complains of comments on the videotape made by
unidentified third parties. On appeal, appellant does not mention the comments of
third parties. His point of error only addresses the prejudicial effect of the reference
to, and videotape of, Hickman’s death—concerns not addressed by this objection in
the trial court. This objection does not preserve this point of error for review. 
          Before the videotape depicting Hickman’s death was offered at trial, appellant
stated that “in addition to the objections lodged yesterday [listed in the preceding
paragraph] particularly with regard to hearsay and Rule 403, which the Court has
previously ruled upon, I’m also objecting under Rule 901 that the videotape has not
been properly authenticated as to all voices on the videotape have not been
identified.” Finally, before the State offered the Hickman urination video, appellant
stated, “in addition to the objections lodged yesterday [set forth in the preceding
paragraph] outside the presence, I would also urge the failure of the State to give
adequate notice of 37.07.” These two passages simply remind the trial court that
appellant previously objected to the prejudicial effect of the third-party comments. 
They do not raise additional 403 objections.
          Where a complaint on appeal does not comport with an objection made at trial,
the error is not preserved on the complaint. Goff, 931 S.W.2d at 551. Because he did
not object to the admission of the videotapes on the grounds urged on appeal,
appellant has failed to preserve the issue for review. Tex. R. App. P. 33.1; see
Montgomery, 810 S.W.2d at 389.
          We overrule point of error three.
Leroy Hall’s Testimony 
          In point of error four, appellant argues that the trial court erred during the
punishment stage of trial in excluding Leroy Hall’s testimony about prison
conditions, which was essential to rebut the State’s lengthy evidence about prison
conditions.
          During the punishment stage, Zunker’s attorney called Reginald Jenkins as a
witness. Jenkins is a detention officer with the Brazos County Sheriff’s Department,
and he was previously employed as a prison guard at a maximum security prison. 
Jenkins testified that Zunker had been a “model inmate” during his more than 300
days of detention at the time of trial. Jenkins explained what a normal day is like for
Zunker while in detention, and that, due to his conviction for aggravated sexual
assault, he cannot be a prison trustee.
          Klock’s attorney questioned Jenkins about the conditions in maximum security
prisons. Jenkins testified that it was “very possible” that the defendants would be
going to a maximum security prison, which holds murderers, major drug dealers,
embezzlers, and forgers. He further testified that there is “rampant gang affiliation”
in prison. 
          On cross-examination, the State elicited more testimony regarding the
conditions in prison. Jenkins testified that rigid laws regulate prisons to make sure
they are safe. Prison units have job fairs and classes allowing the inmates to get
degrees ranging from G.E.D.s to Ph.D.s, and law libraries that are “second to none.” 
Prison units also have exercise weights, baseball diamonds, basketball courts, and
horseshoes. Each prison unit has a minimum of two televisions in each dayroom, and
inmates are allowed to see the National Basketball Association finals and the Super
Bowl on television.
          On re-direct examination, appellant’s attorney asked Jenkins if he felt it would
be helpful to hear from someone who “was actually on the inside looking out.” 
Jenkins responded, “possibly.”
          Later, Zunker’s attorney called Leroy Hall to testify about the time that he
served in the Texas Department of Corrections from 1990-1997. The State objected
that the testimony from Hall concerning prison conditions was irrelevant. Zunker’s
attorney responded that the State had “opened the door to the country club
atmosphere,” and the trial court originally agreed. When the State added that the
witness was an expert who had not been properly designated, the trial court overruled
that objection as well.
          After Zunker’s attorney asked Hall a few more questions, the trial court began
sustaining the State’s “relevance” and “invading-the-province-of-the-jury” objections. 
The trial court then discussed its rulings outside the presence of the jury and
reconsidered and sustained the State’s relevance objection. The defendants’ attorneys
made a bill of exception, and, at the conclusion of the bill, the trial court clarified that
Hall’s testimony was inadmissible, and the court instructed the jury to disregard it. 
The trial court stated that it based its decision on 
401, the relevance. I’m also basing my decision on the fact that I did not
believe the door was opened by the State. Number three, I’m making
my decision on the fact that . . . I still think 701 and 702 may apply and
there should have been a notice given that this person was an expert
witness.

          The Court of Criminal Appeals has explained that, under Texas Code of
Criminal Procedure Annotated article 37.07 section 3(a), the admissibility of evidence
at the punishment phase of a non-capital felony trial is a function of policy rather than
relevancy. See Mendiola v. State, 21 S.W.3d 282, 285 (Tex. Crim. App. 2000);
Miller-El v. State, 782 S.W.2d 892, 895 (Tex. Crim. App. 1990). This is so because,
by and large, there are no discrete factual issues at the punishment stage. Miller-El,
782 S.W.2d at 895-96. Thus, determining what is “relevant” in regard to punishment,
under article 37.07 section 3(a), “should be a question of what is helpful to the jury
in determining the appropriate sentence in a particular case.” Mendiola, 21 S.W.3d
at 285. In Schielack v. State, 992 S.W.2d 639 (Tex. App.—Houston [14th Dist.]
1999, pet. ref’d), when faced with the attempt to introduce similar evidence to that
which was attempted to be introduced here, the Fourteenth Court of Appeals held as
follows:
In the present case, the testimony which [Schielack] sought to introduce
was neither [evidence of the circumstances of the offense itself or the
defendant himself]. In fact, the testimony consisted of another person’s
experiences in prison. There is no evidence that [Schielack’s]
experience would be the same. As such, we believe that the trial court’s
decision to exclude this testimony was at least within the zone of
reasonable disagreement; therefore, the trial court did not abuse its
discretion. 

Id. at 642-43. 
          Appellant argues that Schielack is not instructive because Hall’s “testimony
was not offered to show what Appellant’s experiences would be.” However, during
the defendants’ bill of exception, Hall testified, at length, about the consequences of
being “fresh meat” in prison. After the recitation, Zunker’s attorney and appellant’s
attorney asked Hall to comment as to whether each of the defendants would be treated
as “fresh meat.” Zunker’s counsel asked Zunker to stand and then asked Hall, “What
about a white male that’s never been to prison before that’s his size and weight. Is
he going to be considered fresh meat or not?” Appellant’s attorney then asked
appellant to stand, and he asked Hall, “Are the things that you said pertaining to Mr.
Zunker . . ., would that go for Mr. Schultze as well?” “Yes. It will go for anybody
that goes into the system that’s never been there before.” Contrary to appellant’s
assertion on appeal, Hall’s testimony was elicited specifically to educate the jury on
what appellant’s prison experiences would be.
          The trial court could have reasonably concluded that Hall’s testimony would
not have been helpful to the jury in determining the appropriate sentence in this case. 
Also, the trial court could have reasonably concluded that Hall’s testimony went
beyond the scope of any door opened by the State. Under the precedent of Mendiola,
the trial court’s decision to exclude the testimony of Hall was at least within the zone
of reasonable disagreement. 
          Accordingly, we hold that the trial court did not err in excluding Hall’s
testimony. Having held that the trial court did not err in excluding Hall’s testimony,
we need not determine whether Hall was a properly designated expert.
          We overrule point of error four.
                                                     Jury Argument
          In point of error five, appellant contends that the trial court erred in allowing
the State to argue about the sexual assault’s effect on the complainant’s parents who
did not testify.
          The law provides for, and presumes, a fair trial, free from improper argument
by the State. Long v. State, 823 S.W.2d 259, 267 (Tex. Crim. App. 1991). Proper
jury argument generally must encompass one of the following general areas: (1) a
summation of the evidence presented at trial; (2) a reasonable deduction drawn from
that evidence; (3) an answer to the opposing counsels argument; or (4) a plea for law
enforcement. Guidry v. State, 9 S.W.3d 133, 154 (Tex. Crim. App. 1999); Sandoval
v. State, 52 S.W.3d 851, 857 (Tex. App.—Houston [1st Dist.] 2001, pet. ref’d). To
determine whether a party’s argument properly falls within one of these categories,
we must consider the argument in light of the entire record. Sandoval, 52 S.W.3d at
857. In most cases, if error occurs, an instruction to disregard will cure any error
committed. Shannon v. State, 942 S.W.2d 591, 597 (Tex. Crim. App. 1996).
          During closing argument at the punishment stage, the State argued:
Imagine the embarrassment, the humiliation that [the complainant] has
had to go through. Every time you think about the excuses the
Defendants offered, think about [her], what she’s going through, what
her parents are going through, what her dad is thinking knowing that his
little girl was violated in the worst way.

The trial court overruled appellant’s objection that the prosecutor’s argument was
outside the record. Appellant argues that this statement was a direct violation of the
trial court’s ruling on a motion in limine “that the State’s attorney not mention or state
to the jury the probable testimony of any witness who is absent or unavailable and
was not called to testify in this cause.” 
          The complainant’s parents did not testify; therefore, the argument was outside
the record, and the trial court erred in overruling appellant’s objection. Appellant
concedes that “the error was nonconstitutional; thus, the standard of review is that in
Tex. R. App. P. 44.2(b).” Rule 44.2(b) provides that a nonconstitutional error “that
does not affect substantial rights must be disregarded.” Tex. R. App. P. 44.2(b). 
Determining harm under that standard in improper argument cases requires balancing
the following three factors: (1) severity of the misconduct (prejudicial effect), (2)
curative measures, and (3) the certainty of conviction/punishment absent the
misconduct. Id.; Mosley v. State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998).
Severity of the Misconduct 
          In Martinez v. State, 17 S.W.3d 677 (Tex. Crim. App. 2000), the Court of
Criminal Appeals was faced with a similar issue when it was asked to reverse a death
penalty conviction in light of the following jury argument at the conclusion of the
punishment stage of trial: 
PROSECUTOR: And based on this evidence, this—this rates as one of
the worst crimes, one of the worst killings not only in Brazoria County
but the State of Texas. 
 
DEFENSE COUNSEL: Objection, your honor. That’s not in the record. 

THE COURT: Stay in the record, counsel. 
 
PROSECUTOR: The evidence shows you, these were execution
killings. 26 to 28 bullets. The family of the murdered victims, the
family—the victims themselves, they cry out to you, for the death
penalty in this case. There’s no more--
 
DEFENSE COUNSEL: Objection, your Honor. Not in the record,
either. Absolutely no evidence of that. 
 
THE COURT: Overruled. 
 
PROSECUTOR: Justice in this case requires you, because we told you
from day-one, what we wanted was a fair jury, a jury that would do
justice in this case. 

Martinez, 17 S.W.3d at 692. The court concluded that 
the degree of misconduct, if any, was relatively mild in the present case. 
The prosecutor’s comment that the victims and their families cry out for
the death penalty appears to be intended as a plea for law enforcement. 
The jury was in a position to know that victims who are dead cannot
presently cry out for the death penalty, and that, given the facts
surrounding their deaths, no such cries were made before they died. Nor
would the jurors be surprised to hear that the victims’ families would be
upset with appellant or that they would want retribution. And the
prosecutor did not attempt, through this argument, to convey any
specific facts about the effect of the victims’ deaths upon their families. 
Instead, the prosecutor was pleading with the jury to give the death
penalty because the record before the jury showed that the defendant
deserved it. To the extent that the prosecutor conveyed facts outside the
record, such facts had no tendency to adversely influence the jury
against appellant beyond the influence exerted by a wholly legitimate
plea for law enforcement.

Id. at 693 (emphasis added). Here, like in Martinez, the prosecutor’s comments did
not attempt to convey specific facts about the effect of the complainant’s assault upon
her family so much as it was conveying matters the jury would not be surprised to
hear because they are obvious or common knowledge. Accordingly, we conclude that
the degree of misconduct was minimal.
Curative Measures
          The trial court did not make any attempt to cure the misconduct.
Certainty of Punishment Absent the Misconduct
          Appellant was found guilty of the first-degree felony offense of aggravated
sexual assault—an offense punishable by imprisonment for life or for a term of not
more than 99 years or less than 5 years. See Tex. Pen. Code Ann. § 12.32 (Vernon
2003). If a jury sentences an individual to less than 10 years, it may recommend to
the judge that the imposition of the sentence be suspended and that the defendant be
placed on community supervision. Tex. Code Crim. Proc. Ann. art 42.12, § 4(a),
(d)(1) (Vernon Supp. 2004-2005). Here, almost every defense witness was asked if
he thought appellant should get probation, but the jury assessed punishment at 30
years in prison. To evaluate the “certainty of the punishment absent the misconduct,”
we must examine all the evidence presented during punishment.
          State’s Witnesses
          The jury saw the videotape of Hickman taken shortly before his death. 
Sergeant Fleeger testified that neither Zunker nor Klock was present in the Hickman
video and that appellant’s voice is heard narrating the videotape showing, among
other things, an unconsious Hickman getting his genitals shaven. The jury was also
shown the videotape appellant took, on another occasion, while he urinated on an
unconscious Hickman. Sergeant Fleeger testified that appellant was not a peaceful,
law-abiding citizen and that he has a bad reputation in the community. 
          Detective Harkrider testified that, while he was never implicated in Hickman’s
death,


 appellant was not “truthful” during his discussions with the police. While
Harkrider was investigating Hickman’s death, appellant never mentioned that he had
videotaped the events leading up to Hickman’s death. Appellant never told Harkrider
that water was poured on an unconscious Hickman’s head, that Hickman’s penis was
played with while he lay on the couch, or that someone shaved Hickman’s pubic hair
while he lay on the couch. Detective Harkrider testified that appellant was not a
peaceful, law-abiding citizen and had been cited for criminal mischief. 
          College Station Fire Department Lieutenant Mike Ruesink testified that he
responded to a call at the Bahia house 5:40 a.m. the morning Hickman died, and,
when he arrived, he found Hickman’s heart had stopped beating, and he was not
breathing. He died at the hospital that morning. 
          Karen Rogers, who lived next door to the Bahia house, testified that she was
“afraid to go outside” when appellant was outside.


 She reported that, at 7:50 a.m.
on December 15, 2000, appellant yelled at her as she tried to get in her car to go to
work. He yelled, “I hate my cock-sucking fucking cock-sucking neighbors and that
they were all cock-suckers,” and he threw a beer bottle at her. Rogers called the
police, and appellant told her that “he was going to be [her] worst nightmare” until
she moved out. Tim Rogers, Karen’s husband, went outside and confronted appellant
and, during the confrontation, Tim accused the residents of the Bahia house of failing
to take care of their friend who died. Zunker, who had walked up while appellant and
the Rogerses were arguing, threatened to kill Tim. 
          Police Officer David Robinson responded to Karen Rogers’s call to the police. 
He testified that he took appellant’s and Zunker’s statements, and he did not believe
that either of them was intoxicated when the threat to kill Tim Rogers was made. 
Zunker received deferred adjudication for the incident.
          The jury heard testimony from Mike Patterson, the assistant chief of the
College Station police department, concerning the events surrounding the threat
Zunker made to Tim Rogers. Patterson testified that he attempted to ask Zunker
questions, but appellant would answer for him. He told the jury that appellant “lied
to me from the minute we got there.” 
          Sean Copeland, another Bahia house neighbor, testified that there were parties
at the Bahia house all the time, and there were beer bottles in the yard and glass in the
street. He testified that appellant drove through Copeland’s yard and “peeled out,”
and appellant was cited for “reckless damage” for the damage caused to Copeland’s
yard. 
          College Station Police Officer Rick Vessel testified that, on July 6, 2000, he
was called to the Kettle Restaurant because the manager reported that four men had
stolen two paintings from the restaurant. Two days later, the manager called Vessel
again and said that the men were back. Vessel approached appellant, who was one
of the men that the manager had recognized, and appellant produced one of the
paintings. Appellant was charged with a class C misdemeanor and a criminal trespass
warrant was issued preventing appellant from returning to the restaurant. 
          Bryce Pflughaupt testified that, on December 9, 2000, appellant approached
him at a bar and said, “It’s my birthday. Tonight I’m going to kick somebody’s ass.” 
Appellant approached him a second time and said, “I’ll kill you, mother fucker.” 
Pflughaupt testified that the manager of the bar asked appellant, Klock, and a couple
of other people who were with them, to leave. When Pflughaupt left the bar an hour
and one half later, appellant and his friends were waiting for him. Appellant hit him
and knocked him to the ground. Klock kicked him and prevented him from getting
up. The jury was shown photographs of Pflughaupt taken at the emergency room
after the fight. Pflaughaupt described his injuries to the jury. He said that his “nose
was pretty puffy . . . . [His] eyes swollen shut. [His] lip down on my teeth from that
cut. Bruised. Pretty banged up pretty bad.” He testified that his wrist was broken,
and it required surgery and rehabilitation as a result of the fight initiated by appellant. 
          Jennifer Hovel, a one-time girlfriend of both appellant and Pflughaupt, testified
that, on December 9, 2000, she heard appellant approach Pflughaupt at the bar and
say, “Someone is going to get their ass beat tonight you pussy mother fucker.” The
jury heard a tape recording of a message appellant left on Hovel’s telephone
answering machine after the fight with Pflughaupt. On the message, appellant
apologized for “what he did to Bryce.” He said that he was “real fucked up.” 
          Stephen Rogers testified that he was walking behind Pflughaupt on December
9, 2000, when a group of guys circled Pflughaupt and “basically just beat the crap out
of him.” The circle of guys would not let anyone in to break up the fight. He did not
see who the people were who were fighting Pflughaupt.
          Converse Police Officer Carlos M. Licea testified that, on August 6, 2001, he
saw a truck run a red light at 4 a.m. He was driving over 100 miles per hour, and he
could not catch up to the truck. Officer Licea testified that the truck turned off its
headlights a couple times, and driving at that rate of speed, at that time of the morning
on rural, dirt roads was not safe. Officer Licea ultimately caught appellant when he
turned down a road that was a dead end. The jury was shown appellant’s “mug shot”
that was taken after he was arrested for evading arrest. Appellant told Licea that “he
didn’t feel like stopping. He saw my lights, but he wanted to see if he could get away
from me.” Licea also testified that, once they were in the well-lit police station,
appellant “got at good look” at Licea and said that he “could take [Licea] on or he
could have taken [Licea] on.” Appellant pleaded no contest to the offense and
received deferred adjudication and a fine. This arrest occurred while appellant was
out on bond for aggravated sexual assault.
          Defense Witnesses
          Zachary Kent, who is “very good friends” with appellant, testified that he had
worked at a bar that appellant managed. Kent testified that Pflughaupt was the
aggressor in the fight with appellant. He confirmed that appellant and his friends
were thrown out of the bar the night of the fight. Kent conceded that it was possible
that appellant threw the first punch. Kent left the scene of the fight because the
manager said that “the cops were coming.” 
          Amanda Biggers, whose sister currently dates appellant’s brother, testified that
she first met appellant in high school where appellant was a member of the honor
society and made As and Bs in his classes. He played on the football and baseball
teams and “walked on” to the Texas Tech University football team. Appellant and
Biggers dated off and on for three years. She told appellant that she was concerned
about his increased alcohol consumption, and they ultimately ended their relationship
in November 1999 because he was working too much at the bar. Biggers testified
that appellant treated her “as a boyfriend should treat a girlfriend.” She
acknowledged, however, that, when appellant came by to “talk” while she had a new
boyfriend in her apartment, she called the police because she “wanted [appellant]
escorted off to preempt any other kind of altercation that could have arose.” A
criminal trespass warning was issued against appellant.



          Emily Dreiling testified that she had spent the night at the Bahia house on two
occasions, and she was never nervous. She said that she had driven from Dallas to
College Station at her own expense because she “loves [appellant] to death with all
[her] heart.” Dreiling testified that her sister was the bookkeeper at the bar where
appellant worked, and appellant was the “most dedicated employee that [she had]
seen there.” She further testified that appellant has “always” seemed to be able to
handle his alcohol.  
          Shawn Lindsey, who flew from Lubbock at her own expense, testified that
appellant worked with a good friend of hers. Appellant was always a “perfect
gentleman” to her and her friends, and “he’s a very upstanding young man and he
made a mistake. But we all care about him very much.” Appellant is “not a malicious
person.” Lindsey, who had not seen the video but had seen some photographs of
scenes depicted in the video, testified that “I was expecting something just horrid and
it’s not pleasant, but it’s not — It’s four drunk individuals that weren’t thinking or
acting responsibly.” The State showed Lindsey the photograph depicting appellant
“penetrating an unconscious woman with a plunger handle” and asked Lindsey if she
still did not regard that as “horrid.” She responded that it was not “a pleasant
picture.” She testified that she thought the complainant acted irresponsibly by
“passing out from too much alcohol.” 
Leon Savage, appellant’s high school football special team’s coach, testified 
that, “if [appellant] had been another color, he would have been okay” in college
football. He described appellant as a “motivational leader” on the football team. 
Savage testified that he was “stunned” when he saw the photographs of the sexual
assault, and he agreed that athletics is not an excuse for criminal conduct. 
          Chris Kent, the former bookkeeper for the bar where appellant worked, testified
that appellant worked at the bar more than 60 hours a week. She and appellant dated
for a few months, and she testified that he was always “a perfect gentleman.” When
asked if she had ever seen “pranking” at the Bahia house, Kent responded that
appellant “kept most of that away from me, . . . out of respect for me. . . . [T]hey never
took it to the level of the things that I watched on the tape . . . [b]ut that doesn’t
surprise me that that kind of stuff happened. I mean, it was kind of one of those
things where I knew if I wasn’t there that was probably what was going on.” The
videotape of appellant urinating on Hickman did not surprise her in any way, but she
testified that appellant was “very concerned about Hickman” and was “devastated”
when Hickman died. She said that she cares about appellant as would “anybody who
knew him.” 
          Janet Bardgett, appellant’s high school guidance counsel, testified that
appellant was in the gifted and talented program in high school. The person who
committed this sexual assault is not the same person she saw in high school. Bardgett
agreed that peer pressure and alcohol can cause someone to “do an act that is so
contrary to their character and nature that it shocks everyone, including the person
that did it.” 
          Kim Schultze, appellant’s 14-year-old sister, testified that she has always
looked up to appellant, and he has always taken care of her. While a student at Texas
Tech, appellant wrote to Kim and told her that he would bring her some snow. 
          Susan Schultze, appellant’s mother, is an elementary school paraprofessional,
and her husband, Gary Schultze, appellant’s father, is a foreman of a construction
company. She testified that appellant has always been a “super citizen” and top
achiever in school. She said that athletics “was his life.” Appellant had to work to
afford to stay in college, and, at first, she and her husband did not approve of
appellant working in a bar. Susan testified that she saw an increase in the amount of
alcohol appellant consumed after the spring of 1999. Susan testified that appellant
was raised to know the difference between right and wrong, he was raised in a loving
family, he was never abused, and he knew how to handle his alcohol. She agreed that
“there is no excuse” for what appellant did. Susan testified that she was aware that
her son had been arrested on at least four occasions, and she was aware that
appellant’s bond supervisor in this case had notified him several times to inform him
that he was in violation of the terms of his bond. 
          Zunker testified that he looked up to appellant, “the leader,” and was in awe of
him. He testified that appellant would do things to exercise control over the group. 
Appellant would try to intimidate Zunker by leaving messages on his telephone
saying that Zunker was “a pussy for not coming drinking with them.”
          Dr. James Ezelle, Jr., who practices psychiatry and psychoanalysis, testified
that managing the bar gave appellant the status and power that he lost when he left
football. In Ezelle’s opinion, appellant “conforms to the culture that’s around him”
and that was particularly harmful given the fact that he had known some of the men
in the Bahia house for a long time. Despite the fact that appellant is a bright, hard-working, resourceful leader, “he functions more like an adolescent in which the group
has an inordinate amount of power.” Ezelle acknowledged that he did not verify any
of the information that appellant gave him, including the “n/a” that appellant marked
on the question regarding problematic alcohol use. He agreed that, “at times of
emotional stress and when his ego defenses are already compromised,” appellant may
engage in irresponsible and even illegal activities that will be committed “with little
regard for others.” 
          Rebuttal Witnesses
          On rebuttal, the jury heard testimony from David Batson, the director of
athletics at Texas A&M University. Batson testified that appellant was never on any
sports roster at the university. He explained that there was paperwork indicating that
appellant wanted to be consider for a walk-on position on the football team, but, he
did not make the team. 
          Tommy Davis, appellant’s bond supervisor from the Brazos County
Community Supervision and Corrections Department, testified that appellant violated
his bond in this sexual assault case in the following ways: (1) he failed to mail in
report forms every week; (2) he “never [paid] a penny” despite being required to
make payments; (3) not only did appellant fail to report that he had been arrested for
evading arrest while on bond, he affirmatively told Davis that he had not been
arrested; and (4) he failed to remain offense-free by getting arrested for evading
arrest. Davis testified that appellant should “absolutely not” be considered for
probation. When asked to explain that recommendation, Davis responded:
Three real good reasons: Number one, he was arrested for assault
with bodily injury in College Station back in December 15th or 16th of
2000, was released on $20,000 bond, that case was pending when this
offense took place.


 That’s one reason. 
 
The next reason is the nature of the offense was so depraved, so
demented, so deviant that this man shouldn’t be on the street.
 
Third reason is he’s demonstrated by his performance on bond
supervision that he has no respect for the criminal justice system. He
can’t make an effort and make a payment. He can’t send in a monthly
report form. He can’t find it in himself when he has a first degree felony
pending to obey his bond conditions. I don’t think he deserves
probation at all. 

          On rebuttal, Sergeant Fleeger testified again and stated that, “based on the
heinousness of the crime” and his “knowledge . . .[of] arrests of the Defendants
before and after their arrests for this case,” he did not believe the defendants deserved
probation. He acknowledged that he had never recommended probation as a witness,
but believed that sometimes it is appropriate.
          Here, the jury heard testimony from 10 of appellant’s witnesses. These
witnesses all testified that they came long distances, at their own expense, to testify
on behalf of appellant. The women, most of whom had dated him, testified that
appellant was a “gentleman.” The former coaches testified that appellant was a great
athlete. His mother testified that he was a leader and knew the difference between
right and wrong, and his 14-year-old sister testified that she always looked up to her
brother. The medical expert testified that appellant is bright and hard-working, but
is capable of irresponsible, even illegal activities with little regard for others.
          In addition, the jury saw videotape evidence of appellant engaging in truly
barbaric behavior—the sexual assault of an unconscious young woman—by inserting
a toilet plunger handle in her vagina and suggesting that Klock and Zunker force a
baseball in her vagina, while he manned the video camera. Appellant’s misconduct
was further emphasized by his laughter at the complainant during the assault even
when her vagina was burned by a lit cigarette and a screwdriver was inserted in her
vagina. During the assault, appellant declared that it was “fucking hilarious.” The
jurors saw the videotape appellant took of Hickman shortly before he died. They saw
water being poured over his face, his penis being fondled, and his pubic hair being
shaved while he lay unconscious. They saw a videotape appellant took on another
occasion while he urinated on Hickman while he lay unconscious on the bed. They
heard testimony from several neighbors saying that they were afraid to leave their
homes. They heard testimony from several policemen who testified that the
occupants of the Bahia house were not law-abiding citizens, and they heard from
appellant’s bond supervisor who outlined several ways in which appellant had
violated the terms of his bond while trial was pending in this first degree felony case. 
          Accordingly, we hold with fair assurance that the trial court’s error in
overruling appellant’s objection to the above argument did not influence the jury and
did not affect his substantial rights.
          We overrule point of error five. 
Jury Instruction
          In point of error six, appellant argues that the trial court erred in refusing to
instruct the jury at the punishment stage about the elements of the extraneous offenses
the State asserted against appellant.



          The State presented evidence at the punishment stage that appellant had
committed felony aggravated assault, evading arrest, assault, criminal mischief, and
theft. The trial court denied appellant’s request for a charge setting out the elements
of every extraneous offense the State had asserted. 
          When a complaint is raised on appeal regarding error in the trial court’s charge
to the jury, a reviewing court must determine whether the charge was erroneous, and,
if so, whether the error was harmful to the defendant. See Almanza v. State, 686
S.W.2d 157, 171 (Tex. Crim. App. 1984). The State may offer evidence of
extraneous offenses during the punishment phase of the trial. Tex. Code Crim. Proc.
Ann. art. 37.07 § 3(a)(1). The trial court, as it did here, must charge the jury that it
can only consider such evidence if it finds beyond a reasonable doubt that the
defendant committed the offenses. See Huizar v. State, 12 S.W.3d 479, 483-84 (Tex.
Crim. App. 2000). There is, however, no requirement in our law that all of the
statutory elements of an offense must be proven before a prior unadjudicated
extraneous offense may be admitted at the punishment phase of trial. Spence v. State,
795 S.W.2d 743, 759 (Tex. Crim. App. 1990). Because Spence does not require the
State to prove all the elements in an extraneous offense in the punishment stage and
because of the possibility that it would be confusing to the jury if the trial court
submitted an instruction that included the elements of such extraneous offenses, we
hold that the trial court did not err by refusing appellant’s requested jury instructions. 
          We overrule point of error six.
 
 
 
 
 
Conclusion
          We affirm the judgment.
 
                                                                        George C. Hanks, Jr.
                                                                        Justice

Panel consists of Justices Taft, Jennings, and Hanks.

Justice Jennings dissenting.

Publish. Tex. R. App. P. 47.2(b).